IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:12-CV-78-D

| | | |
|---|---|---|
| LORETTOE M. FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Lorettoe M. Fitzgerald ("Fitzgerald") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner"), denying her application for benefits [D.E. 5].[1] The parties filed motions for judgment on the pleadings [D.E. 23, 28], and memorandums in support [D.E. 24, 29]. As explained below, the court grants the Commissioner's motion, denies Fitzgerald's motion, and affirms the Commissioner's final decision.

I.

On April 30, 2009, Fitzgerald applied for benefits and claimed that she was disabled. Transcript of Proceedings ("Tr.") 70. On her application, Fitzgerald stated that her disability began on November 1, 2005. Id. 19. She later amended the alleged onset date of her disability to April 30, 2009. Id. The Social Security Administration ("SSA") determined that Fitzgerald was not disabled, and denied her application. Id. 73. Upon Fitzgerald's request, the SSA reconsidered her application, but again denied it. Id. 85. Fitzgerald then requested and received a hearing before an

---

[1] Carolyn W. Colvin is Acting Commissioner of Social Security and is substituted as defendant for Michael J. Astrue. See Fed. R. Civ. P. 25(d).

Administrative Law Judge ("ALJ"). Id. 30–69. On September 7, 2011, the ALJ denied Fitzgerald's claim. Id. 19–29. Fitzgerald timely sought review with the Appeals Council, to no avail. Id. 1–5. Fitzgerald timely sought judicial review under 42 U.S.C. § 405(g).

In reviewing the Commissioner's denial of benefits, a district court is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the Commissioner applied the correct legal standards. See 42 U.S.C. § 405(g); Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla of evidence but may be somewhat less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012); Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). When reviewing for substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996), superseded by regulation on other grounds, 20 C.F.R. § 416.927(d)(2). To determine whether a decision is supported by substantial evidence, the court must determine whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439–40 (4th Cir. 1997).

In evaluating disability claims, the Commissioner follows a familiar five-step process. The Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to the claimant's past relevant work; and (5) if not, could perform any other work in the national economy. See 20 C.F.R. § 416.920(a)(4). The claimant has the burden of production and proof in steps one through four. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). If the process reaches step five, the Commissioner has the burden of proving that

2

the claimant, despite impairments, can perform a job that exists in significant numbers in the national economy. See id.; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam).

## II.

At the hearing, the ALJ heard the testimony of Fitzgerald, who was represented by counsel, an independent medical expert, and a vocational expert. Id. 30. Fitzgerald testified about a number of topics, including her work history, daily activities, physical health, and mental health. As for her work history, she testified that she had worked as a hand packer and ingredient mixer at Ann's House of Nuts, a dishwasher at Golden Corral, and a cashier at a convenience store. Id. 38–41. Fitzgerald also explained her reasons for leaving each of her previous positions: respectively, a combination of "transportation issues" and a back injury sustained in a motor vehicle accident, id. 37, 54; pregnancy, id. 40–41; and trouble performing her duties as a cashier. Id. 38–39. As for her daily activities, Fitzgerald testified that she cared for herself and two children, shopped for groceries, cooked, cleaned, and did laundry, attended medical appointments, obtained money orders to pay bills, attended church, and socialized occasionally with friends and family. Id. 46–55. She also testified that she received community assistance in connection with caring for her son, decluttering her home, and managing her finances. Id. 47–49. As for her physical health, Fitzgerald testified that she could sit for 10 minutes, stand for 15 minutes, walk for 10 minutes at a slow pace, and lift up to 10 pounds on occasion. Id. 47–48. She also testified that she had to lie down for up to an hour 2–3 times per day to alleviate the pressure on her back. Id. 43. Finally, with respect to her mental health, Fitzgerald testified that she had suffered from several crying spells per day since losing her twin sister and father. Id. 55. She also discussed hearing voices, seeing spirits, and feeling a presence beside her. Id. 44.

3

Dr. Nathan Strahl, an independent psychiatrist, testified next. Before opining on Fitzgerald's medical conditions, he asked Fitzgerald two follow-up questions concerning her testimony. Id. 57. He first asked her when she had begun hearing voices, to which she responded at age thirteen. Id. He then returned to the topic of her previous employment, and asked her whether she had been "able to work in the past with the voices." Id. Fitzgerald answered affirmatively. Id.

Based upon his independent review of Fitzgerald's medical records, Dr. Strahl then discussed Fitzgerald's mental health. Id. 59. He noted that Fitzgerald had a history of depression and had been treated with Zoloft, a prescription anti-depressant. Id. He also noted that she had run out of her medication in 2008. Id. 59; see id. 500. Dr. Strahl then referred to the consultative psychological evaluation that Dr. John A. "Buck" Thomason had given Fitzgerald pursuant to her application for services through the North Carolina Division of Vocational Rehabilitation Services. Id. 59; see id. 498–506. While he agreed with Dr. Thomason that the difference between Fitzgerald's performance I.Q. of 80 and verbal I.Q. of 66 was significant,[2] he disagreed as to the impact of Fitzgerald's I.Q. on her level of functionality. Id. 60. Specifically, he concluded that the "major issue" regarding Fitzgerald's ability to work was her back pain:

> [T]he medical record indicated that the reason she did not go back to work was because of the back issues from the [motor vehicle] accident . . . . She tried to go back to work . . . but her back issues prevented her from [doing] that. . . . That . . . does tend to specify that the back issues are really the prominent issues, because there's adequate adaptive functioning, although there's borderline IQ, of her ability to work in the past.

Id. Finally, Dr. Strahl opined that Fitzgerald did not have an impairment that met or equaled the

---

[2] Dr. Thomason had reported that Fitzgerald had a verbal I.Q. of 66, a performance I.Q. of 80, and a full scale I.Q. of 70. Tr. 501. Regarding these results, Dr. Thomason had noted that although the numbers "initially suggested that [Fitzgerald] was functioning toward the upper boundary of the Mild Mental Retardation range of intelligence," her "Performance I.Q. will likely prove the better estimate of her overall level of functioning." Id.

4

requirements of a listed impairment. Id. 60–62.

Dr. Mark Stebnicki, a vocational expert, also testified. He stated that a hypothetical individual capable of performing unskilled light work with additional restrictions could find jobs that exist in significant numbers in the region. Id. 66–67. Dr. Stebnicki also testified that a hypothetical individual with the limitations Fitzgerald claimed—one with limited ability to sit, stand, and walk, who experienced crying spells several times per day, and who had to lie down several times per day—would not be able to perform those jobs. Id. 67.

Following the prescribed five-step process, the ALJ found at step one that Fitzgerald had not worked since the onset of her disability on April 30, 2009. Tr. 21. At step two, the ALJ found that Fitzgerald had the severe impairments of sleep apnea, depression with psychotic features, a history of asthma, borderline intellectual functioning, obesity, and a history of ankle injury and arthritis of the knees and back. Id. At step three, the ALJ found that Fitzgerald did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Id. 22–23. At step four, the ALJ found that Fitzgerald has the residual functional capacity ("RFC") to perform light work with certain limitations, namely, that she perform postural activities on an occasional basis, avoid exposure to pulmonary irritants, and perform simple, routine, repetitive tasks in a non-production work environment. Id. 23–28. The ALJ also found that Fitzgerald could not perform relevant past work. Id. 28. At step five, the ALJ found that considering Fitzgerald's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Fitzgerald can perform. Id. 28–29. Accordingly, the ALJ found that Fitzgerald was not disabled. Id. 29.

Fitzgerald seeks reversal of the ALJ's decision and makes one argument.[3] She contends that the ALJ improperly evaluated the medical opinions regarding her mental impairments, in violation of 20 C.F.R. § 404.1527. See Pl. Br. [D.E. 24] 10. Specifically, Fitzgerald faults the weight the ALJ assigned to the opinions of two examining physicians, Dr. Thomason and Dr. Jane Pope. See id. 11. Fitzgerald also claims that "the ALJ ignored every single examining opinion on file," and expressed his own views, when assessing the severity of her mental impairments and their impact on her level of functionality. See id. 11, 13.

Under section 404.1527, the ALJ must decide what weight to assign to a non-treating physician's opinion based on several listed factors, including: (1) the existence, nature, and extent of any treatment or examining relationship; (2) the extent to which the opinion is supported by medical evidence and is consistent with the record as a whole; and, (3) whether the opinion is rendered in an area of specialty. See 20 C.F.R. § 404.1527(c); Radford v. Colvin, No. 13-1021, 2013 WL 5790218, at *6 (4th Cir. Oct. 29, 2013); Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2005); Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005); Craft v. Apfel, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision); Craig, 76 F.3d at 589–90; Regan v. Colvin, No. 7:12-CV-136-D, 2013 WL 5218226, at *4–6 (E.D.N.C. Aug. 20, 2013) (unpublished), M&R adopted, 2013 WL 5242348 (E.D.N.C. Sept. 17, 2013) (unpublished). A district court will not disturb an ALJ's determination as to the weight to be assigned to a medical opinion absent some indication that the ALJ has dredged up "specious inconsistencies" or has not

---

[3] In her request to the Appeals Council, Fitzgerald made two other arguments. First, she argued that she had a mental impairment that met or equaled the requirements of listing 12.05(c). Second, she argued that the combination of her physical and mental impairments otherwise equaled a listed impairment. Tr. 318. Fitzgerald has not raised these arguments on appeal. Thus, the arguments are waived.

given good reason for the weight afforded a particular opinion. Craft, 1998 WL 702296, at *2 (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)); see Hines, 453 F.3d at 563; Johnson, 434 F.3d at 654; Craig, 76 F.3d at 589–90.

Dr. Thomason and Dr. Pope both gave Fitzgerald consultative psychological evaluations on December 3, 2008, and December 5, 2009, respectively. Tr. 26, 498–506, 513–516. Both doctors considered the impact of Fitzgerald's mental impairments on her level of functionality to be more severe than the ALJ ultimately determined it to be. See id. Specifically, Dr. Thomason opined that Fitzgerald might experience difficulty interacting with others, concentrating on assigned tasks, and maintaining her composure, might "prove unable to perform sustained work activity for two . . . hours or more without rest," and might "benefit from a referral to a supported employment setting," "[g]iven her previous difficulties with work in a competitive environment." Id. 504–06. Similarly, Dr. Pope concluded that Fitzgerald would "superficially attempt to relate well to others" and questioned Fitzgerald's ability to "sustain attention to perform repetitive tasks" and "tolerate the stress and pressure associated with day-to-day work activity." Id. 516. The ALJ afforded the opinions of Dr. Thomason and Dr. Pope "little weight" in assessing Fitzgerald's RFC. In doing so, the ALJ found after reviewing Fitzgerald's medical record, that she had received "very minimal treatment" for her mental impairments, had worked outside of the home in the past, and was able to care for her two children, "which can be a mentally and physically demanding job." Tr. 26.

Substantial evidence supports the ALJ's determination to afford little weight to the opinions of Dr. Thomason and Dr. Pope under section 404.1527. That regulation indicates that the more consistent a medical opinion is with the record as a whole, the more weight the ALJ will give it. See 20 C.F.R. § 404.1527(c)(4); Johnson, 434 F.3d at 656; Hill v. Commissioner, 106 F. App'x 159, 160 (4th Cir. 2004); Craig, 76 F.3d at 589–91. As the ALJ explained, the opinions of Dr. Thomason and

7

Dr. Pope conflicted with the other evidence in the record in numerous ways. See Tr. 26. First, both the record and Fitzgerald's own testimony reflect that Fitzgerald received conservative treatment for her mental impairments and that her symptoms were responsive to therapy and medication. For example, with respect to the therapy she received at Dixon Social Interactive Services in early to mid-2011, Fitzgerald indicated several times that "[t]herapy is working for me right now" and recognized the need to attend therapy sessions on a regular basis. See id. 695, 701, 707, 713, 719, 726. Similarly, both Dr. Thomason and Dr. Pope indicated in their reports that medication would ease Fitzgerald's symptoms. Dr. Thomason, who noted that Fitzgerald had run out of her prescribed psychotropic medication due to her inability to pay for it, "strongly encouraged" her to work with her local community mental health center to find a way to obtain the medication. Id. 506. Dr. Pope noted that "[c]ontinued evaluation for psychiatric medication would be helpful" to Fitzgerald. Id. 516. Records from Continuity of Care Behavioral Health Service, however, indicate that Fitzgerald was not taking her mood medications as encouraged. See id. 26, 674. A symptom is not disabling if it can be reasonably controlled by medication or treatment. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986); see Stewart v. Apfel, 182 F.3d 909, 1999 WL 485862, at *4–5 (4th Cir. 1999) (per curiam) (unpublished table decision); Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984); cf. 20 C.F.R. § 416.930(a)–(b).

Second, both the record and Fitzgerald's own testimony reflect that Fitzgerald is able to work and manage her own affairs despite her low intellectual functioning. Fitzgerald held four jobs before April 30, 2009, the alleged onset date of her disability. See Tr. 38–41, 499–500.[4] Although

---

[4] In addition to the three jobs Fitzgerald discussed during her testimony, she also worked as a cook at a fast-food restaurant. See Tr. 500. Dr. Thomason notes that "confusion about doing her job may have resulted in [the restaurant] not calling her to return to work." Id.

8

Case 2:12-cv-00078-D   Document 30   Filed 11/25/13   Page 8 of 10

Fitzgerald left, or was forced to leave, two of these jobs due to trouble performing her duties, she left the other two for reasons entirely unrelated to her mental impairments. Moreover, the evidence on this point is both substantial and consistent throughout the record. See id. 37, 40–41, 54, 57 (Fitzgerald's testimony); 60 (Dr. Strahl's testimony); 499–500 (Dr. Thomason's evaluation); 513 (Dr. Pope's evaluation). Additionally, Fitzgerald can live independently and is only mildly limited in her ability to take care of her daily needs. See id. 46–55. In light of Fitzgerald's ability to work and manage her own affairs despite her low intellectual functioning, the ALJ determined the impact of Fitzgerald's mental impairments on her level of functionality to be less severe than she claimed. See Tr. 27; Hancock, 667 F.3d at 475–76; Hill, 106 F. App'x at 160; Kearse v. Massanari, 73 F. App'x 601, 603 (4th Cir. 2003); Stewart, 1999 WL 485862, at *4–5; Craft, 1998 WL 702296, at *2; Gross, 785 F.2d at 1166. The ALJ's determination as to Fitzgerald's credibility properly influenced the relative weight he assigned to the opinions of Dr. Thomason and Dr. Pope. See Wagner v. Apfel, 201 F.3d 439, 1999 WL 1037573, at *2–3 (4th Cir. 1999) (per curiam) (unpublished table decision).

Next, Fitzgerald argues that "the ALJ ignored every single examining opinion on file" when assessing Fitzgerald's functionality. See Pl. Br. 11. The ALJ's decision belies this argument. Tr. 26–28. So, too, does Fitzgerald's first argument. After all, the ALJ cannot simultaneously ignore and consider—but give little weight to—the opinions of Dr. Thomason and Dr. Pope. To the extent Fitzgerald alleges that the ALJ should have more thoroughly explained the weight given to these opinions, a district court must affirm the decision of an ALJ who "was not as thorough as he could have been" if it finds, after reviewing the record as a whole, that substantial evidence supports the decision. Stewart, 1999 WL 485862, at *5–6. As discussed, Fitzgerald's daily regimen and employment history, coupled with evidence that her symptoms were responsive to therapy and medication, support the ALJ's decision to deny benefits.

9

Finally, the ALJ's written decision belies Fitzgerald's related argument that the ALJ impermissibly substituted his lay opinion for those of professional sources. See Pl. Br. 13. Although the ALJ chose to give little weight to the opinions of Dr. Thomason and Dr. Pope, he attached "significant weight" to the opinion of Dr. Strahl, the independent medical expert, who had "had the opportunity to observe [Fitzgerald] and consider her testimony at the hearing" and based his conclusions "upon the record as a whole." Tr. 25. The ALJ may rely upon the testimony of a non-examining physician when it is consistent with the record. See, e.g., Gordon, 725 F.2d at 235. Dr. Strahl concluded that the "major issue" regarding Fitzgerald's ability to work was her back pain, rather than her mental impairments. Tr. 60. Substantial evidence supports this conclusion, including Fitzgerald's own testimony. See id. 57.

III.

In sum, the court GRANTS the Commissioner's motion for judgment on the pleadings [D.E. 28], DENIES Fitzgerald's motion [D.E. 23], and AFFIRMS the Commissioner's decision. The clerk shall close the case.

SO ORDERED. This _25_ day of November 2013.

JAMES C. DEVER III
Chief United States District Judge